UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| ELIZABETH EAVES, | ) |
| Plaintiff, | ) ) ) |
| v. | ) NO. 2:18-cv-00072 ) |
| EYE CENTERS OF TENNESSEE, LLC, | ) ) |
| Defendant. | ) ) |

MEMORANDUM OPINION

Elizabeth Eaves[1] brought this action against her former employer Eye Centers of Tennessee, LLC ("Eye Centers"), pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., and Tennessee law, alleging that Eye Centers retaliated against her for testifying in court about Eye Centers mismanaging its retirement savings plan. Before the Court is Eye Centers' Motion for Summary Judgment (Doc. No. 29). Eaves has responded in opposition (Doc. No. 31), Eye Centers has replied (Doc. No. 37), and Eaves filed a sur-reply (Doc. No. 41). For the following reasons, Eye Centers' motion will be granted in part and denied in part.

I. **UNDISPUTED FACTS**[2]

On January 29, 1989, Eye Centers hired Eaves as an optician, and she held that position until she became the "Optical Coordinator" sometime around 1998. (DSOF ¶¶ 7, 13, 18, 19.) As

---

[1] Elizabeth Eaves was previously known as Elizabeth Williams. (Doc. No. 1 ¶ 1.)

[2] Doc. No. 37-1 contains the parties' combined statements of fact. For ease of reference, the Court will refer to Eye Centers' Statement of Undisputed Material Facts on pages 1-27 of Doc. No. 37-1 as "DSOF," and Eaves' Additional Disputed Material Facts for Trial on pages 27-49 as "PSOF." The Court also notes that although the parties briefed a wide array of facts in connection with the

Optical Coordinator, Eaves was responsible for, among other things, managing Eye Centers' entire optical department, traveling to the company's satellite offices to consult with opticians, and reporting product and financial information to Raymond Mays, who was her direct supervisor and Eye Centers' CEO. (Id. ¶¶ 20-24; PSOF ¶¶ 2-3.) As long as she completed her job duties, Eaves was permitted to work remotely, was not required to physically report to work every day or record her time worked, and was generally responsive to anyone that needed to reach her by cell phone. (PSOF ¶¶ 14-16.) Eaves performed her job well. (Id. ¶ 13.) There are no documents, records, or performance evaluations evidencing that Eaves ever had any performance or disciplinary issues during her employment with Eye Centers, (Id. ¶ 17), at least until after she testified in court as described below.

Throughout Eaves' employment, Eye Centers offered its employees the opportunity to participate in a 401(k) Profit Sharing Plan (the "Plan"). Eaves contributed to the Plan until late-2013 or early-2014 when she became concerned about both her inability to access her funds and Mays' refusal to provide basic information about the Plan. (DSOF ¶¶ 49-51, 61.) These concerns were substantiated in or around 2014 when the Department of Justice ("DOJ") commenced an investigation into Eye Centers' potential mismanagement of its Plan. (Id. ¶ 55.) As part of the DOJ's investigation, Eaves and other Eye Centers employees were subpoenaed and testified before a federal grand jury regarding Mays' potentially illegal Plan transactions. (Id. ¶ 62.) Based on its investigation and the grand jury testimony, the DOJ produced a criminal information against Mays on December 8, 2015. See United States v. Mays, Case No. 2:15-cr-00005 (M.D. Tenn.), Doc. No. 1. In response, Mays ultimately pled guilty to three counts of "False Statement in Employee

---

instant motion for summary judgment (See Doc. Nos. 29-2, at 2-10; 31-2, at 2-14), the Court will discuss only the background and facts necessary for the resolution of the motion.

Benefit Plan Records," in violation of 18 U.S.C. § 1027, and was sentenced to 2 years of probation. Id., Doc. No. 21.

Around this time, the Department of Labor ("DOL") filed a civil lawsuit against Eye Centers, Mays, the Plan, and Eye Centers' owner, Dr. Larry Patterson, in Perez v. Eye Centers of Tennessee, LLC et al., Case No. 2:14-cv-00115 (M.D. Tenn.) ("DOL case").[3] Eaves was deposed in the DOL case on August 1, 2017, and provided trial testimony against the named defendants on August 8, 2017. (DSOF ¶¶ 68, 73.) Mays and Dr. Patterson were present at the trial and witnessed Eaves' testimony. (Id. ¶ 71.) Other than Dr. Patterson and Mays, Eaves was the only current Eye Centers employee who testified at trial in the DOL case. (PSOF ¶ 21.) After trial, the defendants were found liable and ordered to restore losses to the Plan in an amount exceeding $500,000.[4]

Mays started to distrust Eaves after she cooperated and testified against Eye Centers in the DOL case, particularly because he thought the DOL case was frivolous and that the government was unfairly targeting the company. (Id. ¶¶ 22, 32.) On August 22, 2017—a mere two weeks after Eaves testified at trial in the DOL case—Mays responded to Eaves' email requesting information about a patient's refund with: "Never communicate with me directly again. If a patient needs information [then] have someone else talk to me about it." (Doc. No. 1-8; DSOF ¶ 88; PSOF ¶ 29.) Notwithstanding this email, Eaves still needed Mays' approval and authorization to perform her job duties. (PSOF ¶ 4.) Also after trial, Mays asked another employee, Christa Thompson, to

---

[3] This case is also referred to as Acosta v. Eye Centers of Tennessee, LLC et al., Case No. 2:14-cv-00115 (M.D. Tenn.).

[4] Defendants were originally ordered to pay $971,622.16 to the Plan, (Case No. 2:14-CV-00115, Doc. No. 142), but that amount was later amended to $511,054.86 (id., Doc. No. 151).

3

prepare optical bills for submission, even though Eaves had previously performed this task. (DSOF ¶ 95.)

After receiving Mays' August 22, 2017 email, Eaves eventually contacted an attorney, Dudley Taylor, to try and resolve her issues with Mays. (PSOF ¶ 42.) On September 6, 2017,[5] Mr. Taylor sent a letter to Eye Centers' counsel stating, in relevant part:

> . . . Mays, one of your clients, has effectively ostracized [Eaves] and is preventing her from effectively performing the duties required of her through the employment by [Eye Centers]. These actions on the part of Mr. Mays became evident to [Eaves] shortly after she testified in early August. If there was any uncertainty as to whether this was deliberate or inadvertent, that uncertainty was resolved through an exchange of emails between [Eaves] and Mr. Mays on August 22, 2017. . . .
>
> [Eaves] is the optical coordinator for [Eye Centers], as you know. Although it might be possible for employees in certain positions to continue to perform their jobs without direct contact with Mr. Mays, that is not true with respect to the position of [Eaves]. The prohibition of any direct contact with Mr. Mays not only has an adverse effect on [Eaves], but it is surely detrimental to the efficient operations of [Eye Centers].
>
> I am far from being an expert in employment law. I do know enough, however, to recognize constructive retaliatory discharge when I read this short exchange. . . .

(Doc. No. 1-9; PSOF ¶ 43.) The next day, September 7, 2017, Mays' sent the following email to Eaves:

> I am writing to clarify my August 22nd email regarding communicating with me. For future conversations regarding work matters I request that you copy Christa [Thompson] on emails. When we speak, let's have a third party present during the conversation. This should not limit or interfere with your job responsibilities. Please let me know if these procedures are not acceptable or if you have any questions about these instructions.

(Doc. No. 1-10; DSOF ¶ 89; PSOF ¶¶ 45-46.)

---

[5] It is undisputed that Mr. Taylor's letter was sent on September 6, 2017, but was erroneously dated August 7, 2017. (PSOF ¶ 43.)

On September 8, 2017, Eye Centers' lawyer, Kyle Watlington, responded to Mr. Taylor with a letter stating:

> . . . In your [September 6, 2017] letter, you raised concerns about [Eaves'] working conditions. It is our understanding that [Eaves] has not reported for work since August 22, 2017. [Eye Centers] shares your concerns and wants her to return to work immediately. It has no intention of terminating her employment or otherwise making her employment conditions objectively intolerable.
>
> [Mays] would like [Eaves] to have a third party copied on any emails directed to him so that there is a neutral witness involved and for them to have a similar witness for any in-person conversations. . . . Those steps are standard business practices and should protect everyone's interests. . . .

(Doc. No. 1-11, at 2.) Mr. Taylor and Mr. Watlington then engaged in the following email exchange between September 8, 2017 and September 11, 2017:

| Mr. Taylor: | Thank you for your prompt response, Mr. Watlington, but what is the rationale for proposing such an arrangement? |
| --- | --- |
| Mr. Watlington: | Mr. Taylor, I have been informed that [Eaves] has returned to work and everything appears to have worked out amicably. |
| Mr. Taylor: | I hope that you are right, but does the restraint on direct contact of . . . Mays by [Eaves] except through, or in the presence of, a third party continue to be in force? |

(Doc. No. 1-12.) The parties have not submitted evidence of any subsequent dialogue by Mays or Mr. Watlington in response to Mr. Taylor's final question above.

As of September 8, 2017, Eaves was fearful that Eye Centers would take further actions to make her look like she was bad at her job or would fire her for some fabricated reason, particularly because Eye Centers had never questioned her attendance before. (PSOF ¶ 73.) Given the restraints on Eaves' ability to contact her supervisor and the stress and uncertainty of what would happen to her next, Eaves felt she had no choice but to resign. (Id. ¶ 76.) Eaves submitted her letter of

resignation on September 17, 2017, forty days after she testified at trial in the DOL case. (Id. ¶ 82.)

Based on the circumstances leading to her resignation, Eaves brought claims against Eye Centers under ERISA and Tennessee law, alleging that Eye Centers retaliated against her for providing testimony in the DOL trial. (Doc. No. 1 ¶¶ 125, 131.) Eye Centers now moves for summary judgment on all of Eaves' claims.

## II. LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case. Id.

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595.

## III. ANALYSIS

### A. Eaves' ERISA Retaliation Claim

Section 510 of ERISA "prohibits an employer from retaliating against an employee 'because he has given information or has testified or is about to testify in any inquiry or proceeding relating to [the Act].'" Sexton v. Panel Processing, Inc., 754 F.3d 332, 333 (6th Cir. 2014) (quoting 29 U.S.C. § 1140). In the absence of direct evidence of retaliation,[6] an employee attempting to establish a claim of retaliation under section 510 "must show that (1) she was engaged in activity that ERISA protects; (2) she suffered an adverse employment action; and (3) a causal link exists between her protected activity and the employer's adverse action." Hamilton v. Starcom Mediavest Grp., Inc., 522 F.3d 623, 628 (6th Cir. 2008) (citations omitted).

Because there is no dispute that Eaves engaged in ERISA-protected activity most recently when she testified against Eye Centers in the DOL case, (see Doc. No. 29-2 at 7, 12-13; Doc. No. 31-2 at 15), the only remaining issues are (1) whether Eaves suffered an adverse employment action and, if so, (2) whether there was a causal link between that adverse action and her ERISA-protected activity.

#### 1. Adverse Employment Action – Constructive Discharge

Eye Centers contends that there was no adverse employment action because Eaves voluntarily resigned. (Doc. No. 29-2 at 13.) Eaves counters that she was "constructively discharged" when Eye Centers "took unmistakable actions directed at ostracizing, harassing, and humiliating her in an effort to force her to leave, barred [her] from communicating with her direct

---

[6] "Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 543-44 (6th Cir. 2008) (citations omitted). Despite submitting that "there is direct evidence to support her retaliation" claim, Eaves does not point to any direct evidence of Eye Centers' motivation. (See Doc. No. 31-2 at 15 n.21.) Accordingly, the Court addresses only whether Eaves' has established sufficient indirect evidence to support her claim.

7

supervisor, . . . transferred responsibilities to her subordinate employees, and made performing her job impossible." (Doc. No. 31-2 at 16.) When the facts are viewed most favorably to Eaves and every inference is made in her favor, which the Court is required to do at this stage, the Court agrees with Eaves.

A "[p]laintiff may establish an adverse employment action by demonstrating that she was constructively discharged." Logan v. Denny's, Inc., 259 F.3d 558, 568 (6th Cir. 2001) (citing Kocsis v. Multi-Care Mgmt., 97 F.3d 876, 886 (6th Cir. 1996). To establish a claim for constructive discharge, the plaintiff must present evidence showing that (1) "the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and (2) the employer did so with the intention of forcing the employee to quit." Id. at 568-89 (internal punctuation marks, quotations, and citation omitted).

Regarding the first prong of the constructive discharge inquiry, factors to consider in determining whether a reasonable person would feel compelled to resign include whether the employer's actions involved "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status." Logan, 259 F.3d at 568 (quoting Brown v. Bunge Corp., 207 F.3d 776, 782 (5th Cir. 2000)). Although these factors are meant to aid the Court in its constructive-discharge analysis, they are not exclusive and may be considered singly or in combination. See Saroli v. Automation & Modular Components, Inc., 405 F.3d 446, 451 (6th Cir. 2005). Regarding the second prong, the Sixth Circuit in Smith v. LHC Grp., Inc. clarified that "[t]he employee alleging constructive discharge need not prove that his or her employer undertook

8

actions with the subjective intention of forcing the employee to quit . . . so long as the employee's resignation was a reasonably foreseeable consequence of the employer's actions." 727 F. App'x 100, 106 (6th Cir. 2018) (citations omitted).

This case presents a close question, particularly given the high standard for proving constructive discharge. See Groening v. Glen Lake Cmty. Sch., 884 F.3d 626, 630 (6th Cir. 2018) ("Constructive discharge is hard to prove."). But after considering the totality of the circumstances and drawing all inferences in Eaves' favor, the Court finds that Eaves has raised a genuine issue of material fact as to whether she was constructively discharged from her employment. After the DOL trial, Eye Centers harbored bad feelings about the DOL investigation, trial, and the substantial money judgment. (See PSOF ¶ 22.) Eaves was the only Eye Centers employee who testified against the company. (See id. ¶ 21.) As noted, a mere two weeks after trial Eye Centers showed its resentment when Mays permanently enjoined Eaves from directly communicating with him unless it was through a third party. Although Mays "clarified" his injunction to allow Eaves to directly communicate with him only if a third party was present, he did not make this modification until after Eaves' attorney contacted Eye Centers. This alone permits an inference that Eaves' value to Mays and Eye Centers was low, and that sent a clear message to Eaves that her employment was in jeopardy.

The record before the Court contains more circumstantial evidence that warned Eaves, or any reasonable person, that her employment was in danger. Most notably, the parties vigorously dispute whether Eaves could perform her job duties in light of Mays' August 22, 2017 email telling Eaves to "[n]ever communicate with me directly again," (Doc. No. 1-8), and his September 7, 2017 email requesting that Ms. Thompson be copied on all emails between Eaves and Mays and that a third-party be present during any in-person conversations they had (Doc. No. 1-9). For

purposes of summary judgment, Eaves is entitled to the inference that Mays sent these emails and took these actions primarily as a disciplinary measure for Eaves testifying in the DOL case, and not as a precaution against a potential lawsuit by Eaves. (See Doc. No. 29-2 at 16.) After creating a new condition of Eaves' employment that undermined her authority and hindered communications with her supervisor on a permanent basis, Mays also reassigned some of Eaves' job responsibilities to Thompson without Eaves' knowledge.[7] Although not all of the Logan factors are present in this case, such as a reduction in Eaves' salary[8] or offers of early retirement, when Mays' words and actions are considered together with his position as Eye Centers' CEO and Eaves' supervisor, it is reasonable to infer that they may have created an intolerable working environment for Eaves.[9] See Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1080-81 (6th Cir. 1999) (citation omitted) (denying summary judgment on constructive discharge claim because "[d]ay after day, week after week of isolation on the job and lack of communication would lead [plaintiff] to believe that he was no longer wanted and would continue to receive the cold shoulder as long as he worked there").

---

[7] The parties dispute whether the collection of optical bills was a critical component of Eaves' job or merely an administrative task. (DSOF ¶ 95.)

[8] Eaves' compensation was five percent of the total optical department sales, which made her one of Eye Centers' highest compensated employees. (DSOF ¶¶ 32-33.) There is no indication that her salary decreased between August 8, 2017 and her resignation.

[9] The Court makes this inference at the summary judgment stage without considering hearsay evidence about what other employees may have told Eaves. See Doc. No. 31-2 at 9; see also Tranter v. Orick, 460 F. App'x 513, 514 (6th Cir. 2012) ("Ít is well established that a court may not consider hearsay when deciding a summary judgment motion."). The Court is not bound by this inference at trial, and will make a final determination at that time based on the admissible evidence presented. If those employees testify at trial they may well provide additional details about the chilling work environment Eaves experienced that resulted in her allegedly involuntary resignation.

Moreover, Eye Centers' September 8, 2017 letter creates an issue of fact as to whether a reasonable person would have felt compelled to resign. Eye Centers correctly notes that employees are obligated not to assume the worst and are expected to stay on the job to pursue relief from potential harassment. (See Doc. No. 29-2 at 14-15 (citing Wilson v. Firestone Tire & Rubber Co., 932 F.2d 510, 515 (6th Cir. 1991))); see also McKelvey v. Sec'y of U.S. Army, 450 F. App'x 532, 535 (6th Cir. 2011). Viewing the evidence in Eaves' favor, however, the Court may infer that she hired Mr. Taylor to resolve her issues with Mays instead of jumping to conclusions and quitting prematurely. When Mr. Taylor confronted Eye Centers with allegations of Mays' "constructive retaliatory discharge," the company did nothing to rectify the problem and instead escalated the situation by questioning Eaves' job performance and attendance for the very first time. (Doc. No. 1-11 at 2.) Eaves had reason to believe her work environment was bad and would not improve, and the parties agree that when Eaves received this letter, she "was fearful that [Eye Centers] would take further actions to make her look like she was bad at her job or would fire her for something that was not true since [Eye Centers] had already lied about Eaves' job performance." (PSOF ¶ 73.) The Court finds that Eaves' fears were objectively reasonable. Thus, for purposes of meeting the first prong of the constructive discharge inquiry, Eaves has adduced more than a scintilla of evidence to create an issue of fact as to whether Eye Centers deliberately created intolerable working conditions as perceived by a reasonable person. See Logan, 259 F.3d at 573.

Regarding the employer's intention, a reasonable jury could also conclude that Eaves' resignation was a reasonably foreseeable consequence of precluding Eaves from contacting her own supervisor, along with Mays' and Eye Centers' other actions described above. Eye Centers contends that "it ha[d] no intention of terminating [Eaves'] employment or otherwise making her employment conditions objectively intolerable." (Doc. No. 1-11; see also Doc. No. 29-2 at 17.)

11

However, viewing the facts in the light most favorable to Eaves, Eye Centers did not express this viewpoint until after Eaves obtained legal counsel and reported her concerns to the company. See King v. Cincinnati Pub. Sch., No. 1:17-cv-794, 2019 WL 1167949, at *5 (S.D. Ohio Mar. 13, 2019) (rejecting argument that defendants did not intend for plaintiff to resign because they "did not express this viewpoint until after [plaintiff] contacted both the Human Resources Department and her union to report [employer's] behavior). It is reasonable to infer that Eye Centers may have sent this email merely to manufacture exculpatory evidence in its favor.

Accordingly, the Court concludes that Eaves has raised a genuine issue of fact as to whether she suffered an adverse employment action.

### 2. Causal Link Between ERISA-Protected Activity and Adverse Action

Although the Sixth "Circuit has not adopted a uniform approach on whether a causal connection may be established solely on the basis of temporal proximity," Krumheuer v. GAB Robins N. Am., Inc., 484 F. App'x 1, 5 (6th Cir. 2012), "recently published Sixth Circuit cases seem to suggest that temporal proximity alone is sufficient where the temporal proximity is significant." Brown v. Humana Ins. Co., 942 F. Supp. 2d 723, 735-36 (W.D. Ky. 2013) (citing Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008); Blosser v. AK Steel Corp., 520 F. App'x 359, 363-64 (6th Cir. 2013)). "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." Mickey, 516 F.3d at 525.

Eaves argues that the timing between her DOL trial testimony and her alleged constructive discharge establishes a causal link between the two. Two weeks after Eaves testified at the DOL trial in front of Mays and Dr. Patterson on August 8, 2017, she received Mays' August 22, 2017 email stating she could never again speak to him directly. Mays admitted that he sent this email

12

because he distrusted Eaves after she testified on behalf of the DOL, and because he thought the DOL case was frivolous. (PSOF ¶¶ 22, 32; see also Doc. No. 30-2 at 77-78; 119-10.) Although Eye Centers argues that there can be no causal link because Eaves engaged in ERISA-protected activity for years before her resignation, including testifying before a grand jury in 2014, it was Eaves' testimony in a perceived "frivolous" case that resulted in Eye Centers being ordered to pay a hefty six-figure fine. When judgment entered in the DOL case, Eye Centers had a new reality and Eaves was a day to day reminder of that. Viewing the evidence in Eaves' favor for purposes of summary judgment, the events leading to Eaves' resignation began very shortly after her DOL trial testimony. Further, those events permit an inference of retaliatory intent. Accordingly, the Court finds that there is sufficient evidence to conclude that there is a causal link between Eaves' ERISA-protected activity and her alleged adverse employment action.

In sum, the Court will deny summary judgment on Eaves' ERISA retaliation claim, and will make a final determination of Eye Centers' liability at trial based on the admissible evidence and credibility of all parties and witnesses to this action.[10]

B.   Eaves' State Law Claims

In addition to her ERISA claims, Eaves brought state law claims against Eye Centers under Tenn. Code Ann. § 50-1-304, commonly known as the Tennessee "whistleblower" statute, and

---

[10] Eye Centers' reply brief presents for the first time a new legal argument that it did not advance in its original motion for summary judgment. Specifically, Eye Centers now claims that, assuming *arguendo* Eaves was constructively discharged, Eye Centers had an "unassailable business justification" for eliminating Eaves' job position after her resignation. (Doc. No. 37 at 1, 8-9.) Because the Court has discretion not to address an argument first advanced in a reply brief, it will not consider Eye Centers' new argument for purposes of ruling on the pending motion for summary judgment. See Barany-Snyder v. Weiner, 539 F.3d 327 (6th Cir. 2008) (affirming district court's decision not to address issue raised for the first time in a reply brief). The Court reserves decision on whether Eye Centers' new argument is meritorious until trial. However, the Court notes that the elimination of Eaves' job position may be pretextual or relevant only to damages.

Tennessee common law on wrongful discharge. (Doc. No. 1 ¶133.) Eye Centers argues that these claims should be dismissed because ERISA "preempt[s] state law claims for ERISA retaliation or interference claims." (See Doc. No. 29-2 at 19-21 (citing McSharry v. Unumprovident Corp., 237 F. Supp. 2d 875, 880 (E.D. Tenn. 2002).) In response, Eaves effectively abandons her state law claims and "concedes that [they] may be preempted under ERISA." (Doc. No. 31-2 at 2 n.1.)

The Court agrees that, "[a]s a matter of law, ERISA completely preempts state law claims that 'relate to any employee benefit plan.'" Weaver v. Prudential Ins. Co. of Am., 763 F. Supp. 2d 930, 935 (M.D. Tenn. 2010) (citing 29 U.S.C. § 1144(a)). Here, there is no dispute that Eaves' state law claims "relate to" and are preempted by ERISA, particularly because they are based on Eaves' alleged wrongful discharge for "providing information and testimony regarding [Eye Centers' ERISA] Plan." (Doc. No. 1 ¶¶ 131-33.) Accordingly, Eye Centers is entitled to summary judgment on Eaves' state law claims.

### C. Damages

Eye Centers' reply brief requests "that any Order disposing of the present Motion for Summary Judgment reflect the ERISA preemption resolution and the resulting limitations on damages and scope of recovery under ERISA." (Doc. No. 37 at 9.) Eye Centers does not make any specific arguments about what remedies are available to Eaves, but its citation to McSharry v. Unumprovident Corp., 237 F. Supp. 2d 875, 882 (E.D. Tenn. 2002) suggests that Eaves would not be entitled to compensatory damages for back pay wages or punitive damages under ERISA. As explained in Eaves' sur-reply (Doc. No. 41), however, McSharry provides an incomplete picture of the remedies available under ERISA because it does not address whether back pay could be available as an adjunct to the equitable remedy of reinstatement. See Schwartz v. Gregori, 45 F.3d 1017 (6th Cir. 1995).

The Court reserves decision on what relief could hypothetically be available to Eaves in this case. If the parties want to file a motion in limine on this issue, they are free to do so. At this time, the Court simply orders that if Eaves successfully proves her retaliation claim at trial, her damages in this case, if any, will be limited to those available under ERISA.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. No. 29) will be denied as to Eaves' ERISA claims and granted as to Eaves' state law claims.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE